UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ENDURANCE AMERICAN                    CIVIL ACTION NO. 6:20-cv-00571
INSURANCE COMPANY

VERSUS                                JUDGE HICKS

CHEYENNE PARTNERS, LLC,                MAGISTRATE JUDGE HANNA
ET AL.

## REPORT AND RECOMMENDATION

Pending before the court are cross-motions for partial summary judgment concerning the coverage provided by a commercial general liability insurance policy issued by Travelers Indemnity Company of Connecticut and an excess follow-form insurance policy issued by Travelers Property Casualty Company of America, both of which were issued to Global Data Systems, Inc.  The first motion was filed by cross-claimants Steven Ensminger, Jr.; Stephen Wade Berzas, individually and on behalf of his minor children M.B., G.B., C.B., and K.B.; MacKenzie Berzas; Mignone Denay Crisp, individually and in her capacity as Administratrix for the Estate of Robert Vaughn Crisp, III; and Kristie Danielle Britt (hereinafter collectively referred to in this report and recommendation as "the Claimants") and seeks a declaration that both insurance policies provide coverage to the Claimants for damages sustained as a result of the airplane crash that led to this litigation.  (Rec. Doc. 391).  The second motion was filed by Travelers Indemnity Company of

Connecticut and Travelers Property Casualty Company of America (hereinafter collectively referred to in this report and recommendation as "the Insurers") and seeks a declaration that the policies provide no coverage for the Claimants' alleged damages. (Rec. Doc. 414). The Claimants opposed the Insurers' motion, and the Insurers opposed the Claimants' motion. Additionally, Global Data Systems, Inc.; Southern Lifestyle Development Company, LLC; SLD Aircraft, LLC; Rodney L. Savoy; RRCO Aircraft, LLC; Parkside Properties, LLC; Cheyenne Partners, LLC; Eagle Air, LLC; and Charles E. Vincent filed a brief in support of the Claimants' motion. (Rec. Doc. 411). Finally, Megan Thomas, individually; Megan Thomas and Allen Richardson on behalf of their minor child, Ilan Richardson; Rayna Ledet, individually and on behalf of her minor child, Devynn Mitchell; Rayna Ledet and Rodney Gardner on behalf of their minor children, Rodney Garner, Jr. and Royden Gardner; Ashley Ballard, individually; Ashley Ballard and Anthony Boudreaux on behalf of their minor children, Anthony Boudreaux, Jr. and Alijah Boudreaux; and Ashley Ballard and Roy Nora, on behalf of their minor child, Aron Ballard, filed a brief in support of the Claimants' motion and in opposition to the Insurers' motion. (Rec. Doc. 430). Both motions were referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the court. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it

is recommended that the Claimants' motion should be granted and the Insurers' motion should be denied.

## Background

A small airplane, Piper N42CV (hereinafter referred to as "the Piper"), crashed shortly after takeoff in Lafayette, Louisiana, on December 28, 2019, while headed to the Peach Bowl in Atlanta.  The airplane was owned by Cheyenne Partners, LLC and piloted by Ian Biggs.  Five persons in addition to the pilot were onboard the airplane:  Gretchen D. Vincent, Michael Walker Vincent, Robert Vaughn Crisp, II, Stephen Wade Berzas, and Carley McCord Ensminger.  Mr. Crisp and Mr. Berzas were employed by Global Data Systems, Inc.  Ms. Vincent and Mr. Vincent were the wife and son of Global Data Systems, Inc.'s CEO, Chris Vincent, and the daughter-in-law and grandson of Global Data Systems, Inc.'s founder and chairman of the board, Charles "Chuck" Vincent.  Ms. Ensminger was a friend of Ms. Vincent.  Everyone in the airplane died except Mr. Berzas, who was seriously injured.  Kristie Danielle Britt was seriously injured when the airplane struck her car as it crashed.   Several persons claim to have sustained damages because they witnessed the crash.

This lawsuit began as an interpleader action brought by Endurance Insurance Company under Fed. R. Civ. P. 22.  According to Endurance's complaint, Endurance issued Aircraft Insurance Policy No. NAI6025731 to Cheyenne Partners, LLC,

covering the period from July 1, 2019, to July 1, 2020, with a combined single limit for bodily injury and property damage liability of $5 million each person/each occurrence, including crew and passengers.  Endurance alleged that the additional insureds named in the policy are Eagle Air, LLC; Global Data Systems, Inc.; SLD Aircraft, LLC; Ian Biggs; Southern Lifestyle Development Company, LLC; and Rodney Savoy.  Although many parties claiming an interest in the proceeds of Endurance's insurance policy engaged in pre-suit mediation and filed suits in Louisiana state court, the prosecution of claims arising out of the plane crash – other than in this proceeding – was enjoined.[1]  Accordingly, the claims of all persons allegedly damaged as a result of the crash will be adjudicated in this forum and within the parameters of this lawsuit.

Travelers Indemnity Company of Connecticut issued a commercial general liability insurance policy, Policy No. 630-1D760921, to Global Data Systems, Inc. ("the Primary Policy.")[2]  The CGL part of the policy provides a $2 million general aggregate limit.[3] Travelers Property Casualty Company of America issued an excess follow-form insurance policy, Policy No. CUP-1J918743, to Global Data Systems,

---

[1]     Rec. Doc. 180.

[2]     A copy of this policy is found at Rec. Doc. 401.

[3]     Rec. Doc. 401 at 115.

Inc. ("the Excess Policy.")[4]  It has an excess follow-form and umbrella liability coverage limit of $10 million.[5]  Both policies have a policy period from May 8, 2019 to May 8, 2020.  The Claimants seek coverage under these policies, while the Insurers contend that the policies do not provide coverage for damages sustained as a result of the airplane crash.

## Law and Argument

### A.    The Standard for Resolving a Motion for Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Material facts are those that might affect the outcome of the lawsuit under the governing law.[6]  A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[7]  The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the

---

[4]      A copy of this policy is found at Rec. Doc. 391-4.

[5]      Rec. Doc. 391-4 at 2.

[6]      *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 430 (5th Cir. 2022); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).

[7]      *Sanchez Oil & Gas Corporation v. Crescent Drilling & Production, Inc.*, 7 F.4th 301, 309 (5th Cir. 2021); *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 328 (5th Cir. 2017).

record that demonstrate the absence of genuine issues of material fact.[8]   If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of material fact.[9]   If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.[10]   All facts and inferences must be construed in the light most favorable to the nonmoving party, and the court should neither weigh the evidence nor make credibility findings.[11]

**B.**    **The Standard for Resolving an Insurance Coverage Issue**

In diversity cases, federal courts apply federal procedural rules and the substantive law of the forum state.[12]   Here, Louisiana is the forum state, and subject-matter jurisdiction is based on diversity of citizenship.[13]   Additionally, under

---

[8]    *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007).

[9]    *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d at 536; *Washburn v. Harvey*, 504 F.3d at 508.

[10]    *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d at 536; *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008).

[11]    *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th at 430 (citing *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009)).

[12]    *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 517 (5th Cir. 2015); *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 248 (5th Cir. 2014); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010).

[13]    Rec. Doc. 124.

Louisiana's choice of law rules, "the law of the state where the insurance contract was issued and executed generally governs the interpretation of that contract."[14]  The insurance policies at issue in this lawsuit were issued to Global at its address in Lafayette, Louisiana.[15]    Therefore, Louisiana substantive law regarding the interpretation of insurance contracts must be applied. .The parties are in agreement that Louisiana substantive law is applicable.

Under Louisiana law, the interpretation of an insurance policy usually involves a legal question,[16] and whether an insurance policy provides or precludes coverage is a dispute that can be resolved on a motion for summary judgment.[17] However, "[s]ummary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy,

---

[14]     *Pioneer Exploration, L.L.C. v. Steadfast Ins. Co*., 767 F.3d 503, 512 (5th Cir. 2014) (applying Louisiana law) (citing *Woodfield v. Bowman*, 193 F.3d 354, 360 (5th Cir. 1999)).

[15]     Rec. Doc. 401 at 2 (Primary Policy); Rec. Doc. 391-4 at 2 (Excess Policy).

[16]     *Huggins v. Gerry Lane Enterprises, Inc*., 2006-2816 (La. 05/22/07), 957 So.2d 127, 129; *Bonin v. Westport Ins. Corp*., 2005-0886 (La. 05/17/06), 930 So.2d 906, 910; *Robinson v. Heard*, 2001-1697 (La. 02/26/02), 809 So.2d 943, 945.

[17]     *Huggins v. Gerry Lane Enterprises, Inc*., 957 So.2d at 129; *Bonin v. Westport Ins. Corp*., 930 So.2d at 910; *Robinson v. Heard*, 809 So.2d at 945.

7

when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded."[18]

Under Louisiana law, insurance policies are contracts between the insured and the insurer and are construed using the general rules of interpretation of contracts set forth in the Louisiana Civil Code.[19]   Therefore, the interpretation of a contract requires the determination of the parties' common intent.[20]   In other words, the "parties' intent as reflected by the words in the policy determine the extent of coverage."[21]  If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written."[22]  Consistently, when the terms used in a contract are clear and explicit and do not lead to absurd consequences, no further interpretation may be made in search of the parties' intent.[23]   If the policy contains ambiguous provisions, however, the ambiguous

---

[18]   *Elliott v. Continental Casualty Co.*, 2006-1505 (La. 02/22/07), 949 So.2d 1247, 1253 (quoting *Reynolds v. Select Properties, Ltd.*, 93-1480 (La. 04/11/94), 634 So.2d 1180, 1183); *Westerfield v. LaFleur*, 493 So.2d 600, 605 (La. 1986).

[19]   *Huggins v. Gerry Lane Enterprises, Inc.*, 957 So.2d at 129; *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 06/27/03), 848 So.2d 577, 580.

[20]   Louisiana Civil Code Article 2045.

[21]   *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La. 1994).

[22]   *Cadwallader v. Allstate Ins. Co.*, 848 So.2d at 580.

[23]   Louisiana Civil Code Article 2046.

provisions "are generally construed against the insurer and in favor of coverage."[24] A policy provision is ambiguous if it is susceptible to two or more reasonable interpretations.[25] The determination of whether a contract is clear or ambiguous is a question of law.[26]

The words used in a contract must be given their plain, ordinary, and generally prevailing meaning.[27] If the contract involves a technical matter, however, terms of art and technical terms must be given their technical meanings.[28] The provisions of the contract must be interpreted in light of each other so that each provision is given the meaning suggested by the contract as a whole.[29] "An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to

---

[24]    *Cadwallader v. Allstate Ins. Co*., 848 So.2d at 580.  See, also, Louisiana Civil Code Article 2056.

[25]    *Cadwallader v. Allstate Ins. Co*., 848 So.2d at 580.

[26]    *Sims v. Mulhearn Funeral Home, Inc*., 2007-0054 (La. 05/22/07), 956 So.2d 583, 590; *Cadwallader v. Allstate Ins. Co*., 848 So.2d at 580; *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co*., 93-0911 (La. 01/14/94), 630 So.2d 759, 764.

[27]    *Huggins v. Gerry Lane Enterprises, Inc.*, 957 So.2d at 129; *Cadwallader v. Allstate Ins. Co*., 848 So.2d at 580.  See, also, Louisiana Civil Code Article 2047.

[28]    Louisiana Civil Code Article 2047.

[29]    Louisiana Civil Code Article 2050.

restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion."[30]

Insurers "have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy."[31] "Any exclusion from coverage in an insurance policy must be clear and unmistakable."[32] The party seeking coverage under an insurance policy has the burden of proving the existence of the policy and proving that the policy affords coverage for the subject incident.[33] This often requires a party to prove one or more facts. Indeed, "Louisiana law. . . places the burden on the [insured] to establish every fact essential to recovery and to establish that the claim falls within the policy coverage."[34] On the other hand, the insurer has the burden of proving the applicability of any policy exclusions[35] as

---

[30]    *Huggins v. Gerry Lane Enterprises, Inc.*, 957 So.2d at 129; *Carrier v. Reliance Ins. Co*., 1999-2573 (La. 04/11/00), 759 So.2d 37, 43.

[31]    *Reynolds v. Select Properties, Ltd*., 634 So.2d at 1183. See, also, *Huggins v. Gerry Lane Enterprises, Inc.*, 957 So.2d at 129; *Bonin v. Westport Ins. Corp*., 930 So.2d at 911.

[32]    *Duncan v. U.S.A.A. Ins. Co.*, 2006-363 (La. 11/29/06), 950 So.2d 544, 547; *Roger v. Estate of Moulton*, 513 So.2d 1126, 1130 (La. 1987).

[33]    *Jones v. Est. of Santiago*, 2003-1424 (La. 04/14/04), 870 So.2d 1002, 1010; *Tunstall v. Stierwald*, 2001-1765 (La. 02/26/02), 809 So.2d 916, 921.

[34]    *Bayle v. Allstate Ins. Co*., 615 F.3d at 362  (quoting *Ho v. State Farm Mut. Auto Ins. Co*., 2003-0480 (La. App. 3 Cir. 12/31/03), 862 So.2d 1278, 1281). See, also, *Williams v. Allstate Indem. Co*., 359 Fed. App'x 471, 473 (quoting *Ho v. State Farm Mut. Auto Ins. Co*., 862 So.2d at 1281); *Doerr v. Mobil Oil Corp*., 2000-0947 (La. 12/19/00), 774 So.2d 119, 124, modified on other grounds, 782 So.2d 573 (La. 2001).

[35]    *Rodgers v. State Farm Mut. Auto. Ins*., 2015-0868 (La. 06/30/15), 168 So.3d 375, 376; *Supreme Services and Specialty Co., Inc. v. Sonny Greer, Inc*., 2006-1827 (La. 05/22/07), 958

well as the burden of proving any facts essential to the applicability of relevant policy exclusions.[36]  Policy exclusions must be clearly stated, and any ambiguity in a policy exclusion must be construed to afford coverage.[37]  Moreover, liability insurance policies should be interpreted to effect rather than to deny coverage.[38]  Finally, the "test for construing an insurance policy is not what the insurer intended the words to mean, but how the words would have been understood by a reasonable person in the shoes of the insured."[39]

## C.    The Relevant Policy Provisions

The language set forth in the Primary Policy that is relevant to the pending motions reads as follows:

SECTION I – COVERAGES

COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

---

So.2d 634, 639; *Jones v. Est. of Santiago*, 870 So.2d at 1010; *Tunstall v. Stierwald*, 809 So.2d at 921.

[36]    *Ho v. State Farm Mut. Auto Ins. Co*., 862 So.2d at 1283.

[37]    *Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1252 (La. 1993).

[38]    *Supreme Services and Specialty Co., Inc. v. Sonny Greer, Inc*., 958 So.2d at 638; *Yount v. Maisano*, 627 So.2d 148, 151 (La. 1993).

[39]    *Pathology Laboratory Inc. v. Mt. Hawley Ins. Co*., 552 F.Supp.3d 617, 626 (W.D. La. 2021) (quoting *Dawson Farms, LLC v. Millers Mutual Fire Ins. Co*., 34,801 (La. App. 2 Cir. 08/01/01), 794 So.2d 949, 952, writ denied, 803 So.2d 34 (La. 12/07/01), writ denied, 803 So.2d 37 (La. 12/07/01).  See, also, *Houston Specialty Ins. Co. v. Meadows West Condo Ass'n*, 640 Fed. App'x 267, 271 (5th Cir. 2016).

1.    Insuring Agreement

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damaged" to which this insurance does not apply.[40]

*****

2.    Exclusions

This insurance does not apply to:[41]

*****

g.    Aircraft, Auto or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

*****

(6)    An aircraft that is:

(a)    Chartered with a pilot to any insured;

---

[40]    Rec. Doc. 401 at 119.

[41]    Rec. Doc. 401 at 120.

(b)     Not owned by any insured; and

(c)     Not being used to carry any person or property for a charge.[42]

Because the Excess Policy follows the form of the primary policy, this same provision is deemed to be set forth in that policy as well.[43]

The Claimants contend that coverage is provided by the insurance policies because the exception to the exclusionary language applies in this case, while the Insurers contend that two of the conditions set forth in the exception to the exclusion are not satisfied, precluding coverage. Thus, whether the exception to the exclusion applies is the issue at the crux of the cross-motions. When an exclusion set forth in an insurance policy has an exception that would allow for coverage, the exclusion does not apply if the exception is met.[44] Further, the insurer has the burden of proving that the exception is not met in order to show that the exclusion does apply.[45]

---

[42]     Rec. Doc. 401 at 122.

[43]     *Admiral Insurance Co. v. Zadeck Energy Group Inc*., 413 F.Supp.3d 523, 529 (W.D. La. 2019) ("The obligations of following-form excess insurers are defined by the language of the underlying policies, except to the extent there is a conflict between the two policies, in which case, absent excess policy language to the contrary, the wording of the excess policy will control. Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 13.01[a] (18th ed. 2017) (citing, *inter alia*, *Estate of Bradley v. Royal Surplus Lines Ins. Co. Inc*., 647 F.3d 524, 530 n.4 (5th Cir. 2011)).").

[44]     *Veuleman v. Mustang Homes, LLC*, 2013-190 (La. 04/05/13), 110 So.3d 572, 573.

[45]     *Veuleman v. Mustang Homes, LLC*, 110 So.3d at 573.

**D.    <u>Does the Aircraft, Auto or Watercraft Exclusion Apply</u>?**

The Aircraft, Auto or Watercraft Exclusion "was designed to eliminate coverage under a general liability policy for risks arising out of the ownership, maintenance or use of automobiles, aircraft and certain watercraft, which risks should be covered under an automobile, aircraft or marine liability policy."[46]  The exclusion states that bodily injury arising out of the use of any aircraft operated by any insured is excluded from coverage.  In this case, the Claimants alleged that bodily injuries were sustained as a result of the use of the Piper while it was being operated by an insured.  It is undisputed that the pilot was a Global employee.  Thus, there is no dispute that the claims fall within the scope of the Aircraft, Auto or Watercraft Exclusion.  While identical and similar Aircraft, Auto or Watercraft Exclusion have been found to be unambiguous,[47] this Court was unable to locate any

---

[46]    William Shelby McKenzie and H. Alston Johnson, III, 15 Louisiana Civil Law Treatise, Insurance Law and Practice, § 6:13 at 548-549 (4th Edition 2012).

[47]    See, e.g., *Cosey v. Flight Academy of New Orleans, LLC*, 2019-0757 (La. App. 4 Cir. 05/13/20), 2020 WL 2478462, at *5, writ denied, 302 So.3d 536 (La. 10/06/20), and writ denied, 303 So.3d 651 (La. 11/4/20); *McQuirter v. Rotolo*, 2011-0188 (La. App. 1 Cir. 09/14/11), 77 So.3d 76, 83, aff'd as amended on other grounds, 77 So.3d 76, 83 (La. 09/14/11); *Vise v. Olivier House Prop. Mgmt., LLC*, 16-0741 (La. App. 4 Cir. 04/12/17), 216 So.3d 157, 162; *Harrison v. Exide Technologies, Inc*., No. 04-699-JJB, 2006 WL 8432851, at *8 (M.D. La. Aug. 29, 2006).

decision construing the three-part exception to the exclusion that is set forth in the Primary Policy.

**E.    Do the Exceptions to the Aircraft, Auto or Watercraft Exclusion Apply?**

The Aircraft, Auto or Watercraft Exclusion does not apply when three conditions are satisfied:  the airplane is chartered with a pilot to an insured, the airplane is not owned by any insured, and the airplane is not being used to carry any person or property for a charge.  Because the word "and" joins the three conditions, the exclusion is conjunctive and all three conditions must be satisfied for the exception to the exclusion to be triggered.  The inclusion of the exception to the exclusion in the policy indicates that the parties to the insurance contract intended to expand coverage under the policy in certain circumstances.  This intent was not disputed by the Insurers.

**1.    Was the Airplane Chartered With a Pilot to an Insured?**

The first element of the exception to the exclusion requires that the airplane be chartered with a pilot to an insured.  The Insurers argued that the airplane was not chartered with a pilot to an insured on the day of the crash at issue.  Because the word "chartered" was not defined in the insurance policies, a search must be made for the plain, ordinary, and generally prevailing meaning of that word.  In reaching

that goal, it is helpful to understand how the Piper was shared by the Vincent interests on one hand and the Savoy interests on the other hand.

Charles "Chuck" Vincent was Global's chief executive officer and majority shareholder until September 2019 when his son Chris Vincent[48] purchased his shares and became Global's CEO under the condition that the company would continue to pay for the Piper, the pilot, and Mr. Vincent's use of the airplane.[49]  It is undisputed that Mr. Vincent was a pilot and aviation enthusiast for many years.  In 1999, Mr. Vincent formed Eagle Air, LLC to hold his pleasure assets including aircraft.[50] Eagle Air purchased the Piper in 2000, sold it in 2006, repurchased it in 2008, and then sold it to Cheyenne Partners, LLC in 2015.[51]  Mr. Vincent formed Cheyenne Partners, LLC to be the registered owner of the Piper, with Eagle Air as the sole member of the company.[52]  At the time of the crash in December 2019, the Piper was owned by Cheyenne Partners, LLC.[53]

---

[48]    Hereinafter, Chuck Vincent will be referred to as Mr. Vincent, and Chris Vincent will be referred to by using both his first and last names.

[49]    Rec. Doc. 391-5 at 234-235.

[50]    Rec. Doc. 412-2 at 50; Rec. Doc. 412-3 at 14.

[51]    Rec. Doc. 412-2 at 39-40.

[52]    Rec. Doc. 412-5 at 7-8.

[53]    Rec. Doc. 391-7 at 138; Rec. Doc. 412-5 at 6-7, 9, 44.

In 2015, Mr. Vincent and Rodney Savoy entered into an agreement to share the use of the Piper.[54]  Mr. Vincent and Mr. Savoy are friends,[55] and Mr. Savoy is a member of Southern Lifestyle Development Company, LLC (hereinafter referred to as "SLD"), a real estate development company.[56]  Eagle Air sold 50% of its membership to SLD Aircraft, LLC, a Savoy-related entity.[57]  Thereafter, SLD, its members (including but not limited to Mr. Savoy), employees, and guests could use the Piper on an as-needed basis; similarly, Mr. Vincent, Global, Global's employees, and guests could use the Piper on an as-needed basis.[58]

Mr. Vincent and Mr. Savoy originally agreed that the Piper's fixed costs, including insurance, would be split 50/50 regardless of either party's plane usage, then later agreed to adjust expenses on the basis of each party's flight time.[59]  Each party paid an hourly charge for the use of the aircraft to create a reserve for anticipated engine overhaul work, which was billed monthly,[60] as well as its own

---

[54]    Rec. Doc. 391-6 at 79-80, 195-196.

[55]    Rec. Doc. 391-7 at 136.

[56]    Rec. Doc. 412-6 at 7.

[57]    Rec. Doc. 391-6 at 63; Rec. Doc. 391-7 at 139; Rec. Doc. 412-5 at 8.

[58]    Rec. Doc. 391-7 at 145.

[59]    Rec. Doc. 391-6 at 194-198; Rec. Doc. 391-7 at 167-172, Rec. Doc. 412-7.

[60]    Rec. Doc. 391-7 at 169.

fuel costs.[61]  Mr. Biggs, the pilot, was employed by both Global and SLD, with each party paying half of his annual salary and benefits regardless of the amount of time he flew for each party.[62]

When Global, SLD, or persons affiliated with Mr. Vincent, Mr. Savoy, or their companies wanted to use the Piper, they contacted Mr. Biggs directly to make the arrangements; there was no requirement that Mr. Vincent, Mr. Savoy, or anyone on the opposite side of the equation had to be consulted or asked for permission to use the plane.[63]  When Cheyenne Partners provided the Piper for use by Mr. Vincent, Global, SLD, Mr. Savoy, or persons affiliated with either of them, it was always provided together with a pilot.[64]

Cheyenne Partners is in the air transport business, but is not, and never intended to become, an entity that provides commercial aircraft operations such as private air charter and air taxi flights regulated by 14 C.F.R. Part 135.[65]  Cheyenne Partners does not hold itself out to the public as having an aircraft that is available

---

[61]    Rec. Doc. 391-7 at 171.

[62]    Rec. Doc. 391-5 at 272; Rec. Doc. 412-4 at 362, 370-371, 374; Rec. Doc. 412-6 at 40.

[63]    Rec. Doc. 391-5 at 283-285; Rec. Doc. 412-6 at 64.

[64]    Rec. Doc. 391-5 at 340-341; Rec. Doc. 391-7 at 163.

[65]    Rec. Doc. 391-7 at 163-164.

for public use; instead, the Piper was only available for use by members of Cheyenne Partners, their affiliated companies, members, employees, and guests.[66]

Global's CEO Chris Vincent testified at his deposition that he "arranged the flight"[67] that was to take the passengers to the Peach Bowl in December 2019 by calling Mr. Biggs on the telephone and advising where the flight was to go and how many people were going.[68]  Mr. Vincent, the corporate representative for Cheyenne Partners, confirmed that Chris Vincent scheduled the flight.[69]  The corporate representatives of Global and Cheyenne Partners both testified that whenever the Piper was used by anyone, a pilot was provided along with the airplane.[70]  Mr. Biggs, the pilot at the time of the crash, was the plane's full-time pilot.[71]  Global paid half his salary, and SLD paid the other half regardless of the flight time Mr. Biggs logged for either entity.[72]  Mr. Biggs was on-call to fly the plane for either of his employers.[73]

---

[66]    Rec. Doc. 391-7 at 163-164.

[67]    Rec. Doc. 391-5 at 51, 60, 164.

[68]    Rec. Doc. 391-5 at 164, 283-285.

[69]    Rec. Doc. 391-6 at 219.

[70]    Rec. Doc. 391-5 at 340-341; Rec. Doc. 391-7 at 163.

[71]    Rec. Doc. 391-5 at 272, 277.

[72]    Rec. Doc. 391-5 at 272; Rec. Doc. 412-6 at 40.

[73]    Rec. Doc. 391-6 at 86-85.

At the time of the applicable policy period in May of 2019 Global was not in the aviation business and did not own any aircraft.[74]  Global did employ the full-time pilot for the airplane which was owned by an affiliated company and subject to the agreement between Mr. Vincent and Mr. Savoy for the exclusive use of that airplane. Chris Vincent stated that Global paid for access to the airplane.[75]  Mr. Vincent similarly testified that Global and SLD each paid a monthly sum for the right to use the plane.[76]

The Insurers argued at oral argument that their intention was to provide coverage to Global for the occasions when Global chartered a plane from a commercial charter service.  But there is no language in the exception to the exclusion that limits the word "charter" to the commercial charter context.  Further, there is no evidence in this record that Global ever engaged in such an endeavor and the Insurers have offered no such evidence beyond argument.  Nor would it have made sense for Global to seek out a commercial charter service when Global had exclusive access to a plane it shared with the SLD interests.  Absent the undisputed arrangement between Mr. Vincent and Global on the one side and Mr. Savoy and the SLD-related companies on the other side, there would be no viable reason for

---

[74]    Rec. Doc. 391-5 at 221-222

[75]    Rec. Doc. 391-5 at 222.

[76]    Rec. Doc. 391-7 at 52-55.

the parties to the insurance contract to broaden the coverage afforded by the relevant policies to provide coverage for the arrangement that would otherwise fall within the aircraft exclusion. The most logical inference to be drawn is that the admitted expansion of coverage created by the exception was intended to address this arrangement where Global used a plane it did not own on a regular basis that always came with a pilot whose employment was dedicated solely to flying this aircraft. The suggestion by the Insurers that the exception used to expand coverage was not created for this unique situation but for what amounts to a factually non-existent situation is an absurd result given the undisputed facts that existed at the time the policy was confected.

The insurers had the opportunity to define the words "charter" or "chartered" but declined to do so. Because the term "chartered" is not defined in the policy, the common understanding of that word must be determined. In this context, Black's Law Dictionary defines the word "charter" as the "leasing or hiring of an airplane, ship, or other vessel."[77] Black's Law Dictionary also defines the word "hire" as "to procure the temporary use of property, [usually] at a set price."[78] Therefore, the word "chartered," as it was used in the policy, can be defined as meaning "obtained the temporary use of the airplane."

---

[77]    Charter, Black's Law Dictionary (9th ed. 2004).

[78]    Hire, Black's Law Dictionary (9th ed. 2004).

The parties did not identify any prior decisions construing the words "charter" or "chartered" in this context. The Insurers suggested that this Court should rely on a decision from the Louisiana Second Circuit,[79] which presented a set of facts remarkably similar to those of this case. An airplane was titled in a company that was owned by two men who used the airplane for business and pleasure. When either man used the plane, he paid a per flight-hour charge to the company that owned the plane to cover fuel and maintenance. Even though the company that owned the airplane had the word "charter" in its name, it did not offer air transportation to the public; instead, the company was described as a convenient way to hold title to the airplane and account for the airplane's expenses. When one of the two men was flying the plane in bad weather on a business trip for another company that he owned, the plane crashed and he and his passengers died. An aircraft insurance policy that was issued to the company that owned the plane stated that there was no coverage if the aircraft was "leased or rented to or hired by others."[80] The appellate court found that the trial court did not err in holding that the plane had not been leased or rented to the pilot or his other company. But the court did not address the policy's use of the word "hired," and the policy did not include

---

[79]    *United States Fire Ins. Co. v. West Monroe Charter Service*, 18,416 (La. App. 2d Cir. 1987), 504 So.2d 93, writ denied, 505 So.2d 1411 (La. 1987).

[80]    *U.S. Fire Ins. Co. v. West Monroe Charter Service, Inc*., 504 So.2d at 101.

the words "charter" or "chartered."  An insurance policy must be read in its entirety, and words used in the policy cannot be ignored.  Therefore, this case provides little guidance for the interpretation of the exception to the exclusion.

In attempting to define the term "charter party agreement," a Florida court defined the term "charter" to mean "to hire, rent, or lease for usually exclusive and temporary use," adopting a dictionary definition.[81]  Consistently, a few courts have relied on the Black's Law Dictionary's definitions of the terms "charter" and "hire" to interpret the meaning of insurance policy provisions.  For example, when attempting to determine whether there was an oral or written charter party between two entities, the Eastern District of Louisiana noted that Black's Law Dictionary defined the term charter to mean "[t]he leasing or hiring of an airplane, ship, or other vessel."[82]  A Mississippi federal court referred to the "charter hire of a plane."[83]  Similarly, the Supreme Court of Ohio adopted the Black's Law Dictionary definition when interpreting the meaning of the term "hire" used in an insurance contract.[84]  A

---

[81]    *Katchmore Luhrs, L.L.C. v. Allianz Global Corp. & Specialty*, No. 15-CIV-23420, 2017 WL 201840, at *6 (S.D. Fla. May 3, 2016) (citing Merriam-Webster.com).

[82]    *Coakley v. SeaRiver Maritime, Inc*., 319 F.Supp.2d 712, 716 n. 3 (E.D. La. 2004), affirmed, 143 Fed. App'x 565 (5th Cir. 2005) (quoting Black's Law Dictionary 228 (7th ed. 1999)).

[83]    *Cantrell v. Vickers*, 524 F.Supp. 312, 319 (N.D. Miss. 1981).

[84]    *National Union Fire Insurance Company of Pittsburgh, PA v. Paterson*, 417 F.Supp.3d 888, 895 (N.D. Ohio 2019) (citing *Fed. Ins. Co. v. Exec. Coach Luxury Travel, Inc*., 944 N.E.2d 215, 219 (Ohio 2010)).

New York court declined to differentiate the charter of a bus from the rental of a bus, noting the definition of the word "charter" used in Black's Law Dictionary but stating that "average persons commonly understand that a charter is a synonym for, or at a minimum a subset of, a rental, with the only difference being that a charter connotes some exclusivity of purpose to the rental."[85]  But the word "charter" was not in the insurance policies being interpreted in those cases, and none of the conclusions reached in the cited cases are binding on this court.

The Aircraft, Auto or Watercraft Exclusion set forth in the Primary Policy uses the words "owned," "operated," "rented," and "loaned."  None of those words are in the first element of the exception to the exclusion.  Instead, this element requires an airplane to be "chartered" to an insured in order to circumvent the exclusionary language.  The deliberate use of the word "chartered" indicates that the Insurers meant something different from the words "owned," "operated," "rented," and "loaned" that they had previously used in crafting the exclusion.  The Insurers failed to define the word "chartered" in the Primary Policy.  A failure to include a definition does not automatically render a word ambiguous but, in this case, it necessarily requires the Court to interpret *all* of the policy language in a manner that meets the parties' intent.  Since this is the only provision using the word charter, it

---

[85]    *Richards v. Princeton Ins. Co.*, 178 F.Supp.2d 386, 395 (S.D.N.Y. 2001).

must be interpreted in a manner to support the admitted intent to expand coverage otherwise limited by the exclusion

The word "charter" is commonly used in an admiralty or maritime context, and there are three recognized types of maritime charters.  In fact, "bareboat charter," "voyage charter," and "time charter" are terms of art with specific, well-recognized, and specialized meanings in admiralty law that do not directly translate to the use of the airplane involved in this lawsuit but at least provide some food for thought.  A demise or bareboat charter of a vessel is "essentially the lease of a ship, usually on a long-term contract, often associated with a special finance or purchase arrangement."[86]  With a bareboat charter, "the entire command and possession of the vessel [is] turned over to the charterer.  Although the owner retains legal title, the charterer is considered the temporary owner, or commonly termed the owner *pro hac vice*."[87]  "In a voyage charter, one party, the carrier (who either owns or manages a ship) promises to transport a certain amount of cargo from one port to another (the voyage) in return for compensation called freight  The other party, the charterer, promises to deliver the cargo to the ship and to pay the freight."[88]  "The time charter party is a contract of affreightment to use a ship in order to ship goods for a specific

---

[86]    Thomas J. Schoenbaum, Admiralty and Maritime Law § 11-3 (6th ed. 2021).

[87]    Thomas J. Schoenbaum, Admiralty and Maritime Law § 11-3 (6th ed. 2021).

[88]    Thomas J. Schoenbaum, Admiralty and Maritime Law § 11-4 (6th ed. 2021).

period of time.  The carrier makes the ship's capacity available to the time charterer for this purpose.  The charterer bears the expenses connected with each voyage and pays hire to the carrier based upon the time the ship is under charter."[89]

The Fifth Circuit compared air charters to vessel charters and determined that there are three basic types of air charters.

> (1) In a 'bare-hull', 'hire', or 'lease' charter the owner (airline) merely supplies a plane, without a crew, to a charterer, who may use it where and when he pleases; the charterer furnishes the crew and pays the expenses of operating the aircraft.  (2) In a 'time charter' the airline provides the charterer with an equipped plane and crew for a specific period of time to use as the charterer wishes.  (3) In a 'voyage charter' the owner charters his fully equipped plane and crew for a predetermined voyage.[90]

Consistently, when a company agreed to provide two aircraft and crews to be used at the discretion of the United Nations on an as-needed basis, a federal district court in New York stated that the parties' agreement "is simply a time charter agreement."[91]  The time charter most closely approximates the overall arrangement between Mr. Vincent and Mr. Savoy regarding the use of the Piper as well as the specific arrangement for the day of the crash.  The overall arrangement allowed Global to use the Piper whenever it wished to do so for business or personal

---

[89]    Thomas J. Schoenbaum, Admiralty and Maritime Law § 11-5 (6th ed. 2021).

[90]    *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 329 (5th Cir. 1967).

[91]    *Adjoyi v. Federal Air (PTY) Ltd*., 137 F.Supp.2d 498, 500 (S.D.N.Y. 2001).

purposes, with Global paying the connected expenses. The specific arrangement for the Peach Bowl allowed Global to use the Piper to take the passengers to the football game and return them to Lafayette, with Global paying the connected expenses. This comports with the Black's Law Dictionary definition of the word "charter" as hiring or procuring the temporary use of the airplane.

The jurisprudence also provides some guidance regarding the generally understood meaning of the word "charter." The term "chartering an airplane" can mean obtaining the use of an airplane.[92] It can mean making the use of an airplane available to others.[93] The term "chartered airplane" can be used to distinguish an

---

[92]    See, e.g., *Matter of Ensco Offshore Company*, No. 4:09-CV-2838, 2014 WL 12863570, at *3 (S.D. Tex. Sept. 30, 2014) ("Ensco chartered a fixed wing, twin-engine plane. . . to conduct an initial air survey. . . ."); *ARV Offshore Co., Ltd. v. Con-Dive, L.L.C.*, 514 Fed. App'x 524, 526 (5th Cir. 2013) ("ARV chartered and paid for a cargo plane to transport the Orca to Texas."); *ARV Offshore Co., Ltd. v. Con-Dive, L.L.C.*, No. H-09-0944, 2012 WL 176322, at *2 (S.D. Tex. Jan. 20, 2012), aff'd 514 Fed. App'x 524 (5th Cir. 2013) ("ARV entered into an Aircraft Charter Agreement. . . to provide an AN124 aircraft. . . to transport the Orca. . . ."); *Smith v. American Family Life Assur. Co. of Columbus*, 584 F.3d 212, 213 (5th Cir. 2009) ("Mr. Smith boarded a helicopter in Patterson, Louisiana, that had been chartered by Apache to transport him and several other employees to an offshore platform in the Gulf of Mexico."); *Nayani v. Horseshoe Entertainment*, No. 3:06-CV-01540-M, 2007 WL 1062561, at *3 (N.D. Tex. Apr. 10, 2007) (a casino had an agreement with another company "to charter an aircraft to fly customers from north Texas to its casino."); *Breaux v. Haliburton Energy Servs., Inc.*, No. 04-1636 c/w 05-896, 05-897, 2005 WL 8162241, at *1 (E.D. La. Dec. 14, 2005) (a company "chartered the helicopter from defendant. . . who owned and operated the aircraft, to transport the workers to the vessel."); *J & D Aircraft Sales, LLC v. Continental Ins. Co.*, No. 3:03-CV-0007-B, 2004 WL 2389445, at *9 (N.D. Tex. Oct. 26, 2004) ("he was intending to charter another airplane to transport himself and some guests to his home"); *Acosta v. Master Maintenance*, 192 F.Supp.2d 577, 590 (M.D. La. 2001) ("a plane was chartered for five (5) people to travel to Houston. . .").

[93]    See, e.g., *York v. Tropic Air, Ltd.*, No. V-10-55, 2012 WL 1077198, at *4 (S.D. Tex. Mar. 28, 2012) (describing Tropic Air as a company that "chartered aircraft to Texas residents.").

exclusive, privately-arranged flight from a regularly scheduled flight offered by an airline.[94]  Thus, a person using a charter service would have a plane "on-call" rather than having to rely on an airline's schedule of flights to particular destinations.[95]  "The key attribute of charter service is its availability at a time and place dictated by the customer."[96]  Therefore, a baseball team might enter into a charter agreement with a company that owns or leases airplanes to use the company's planes to fly the team's players to away games.[97]  An air charter company's business might be described as "arrang[ing] charters of private aircraft for its customers, using its own

---

[94]     See, e.g., *Fauver v. Seadrill Americas, Inc*., No. 5:15-cv-49(DCB)(MTP), 2016 WL 4098601, at *1 (S.D. Miss. July 28, 2016) ("The plaintiff was. . . flown by chartered airplane to Brownsville. . . ."); *United States v. Massi*, No. MO-12-CR-153, 2012 WL 12871174, at *4 (W.D. Tex. Sept. 19, 2012), aff'd 761 F.3d 512 (5th Cir. 2014) ("the length of time that Defendant and his chartered plane were detained here was. . . not unconstitutional. . . ."); *Dalrymple ex rel. Dalrymple v. Fairchild Aircraft Inc*., 575 F.Supp.2d 790, 793 (S.D. Tex. 2008) ("This case arises out of. . . a non-scheduled international commercial flight operated by. . . a Spanish charter company."); *Acosta v. Master Maintenance*, 192 F.Supp.2d at 589 ("Limousines and chartered planes were often used by the attorneys due to the number of people involved and the large number of documents they had to take with them."); *Fogleman v. ARAMCO (Arabian American Oil Co.)*, 920 F.2d 278, 281 (5th Cir. 1991) (after a heart attack, "[h]e was then evacuated on an ARAMCO charter plane to Houston, Texas, where he underwent triple bypass surgery.").

[95]     *Ireland v. U.S.*, 621 F.2d 731, 738 (5th Cir. 1980).

[96]     *Ireland v. U.S.*, 621 F.2d at 738.

[97]     See, e.g., *In re Texas Rangers Baseball Partners*, 521 B.R. 134, 143-145 (N.D. Tex., 2014).

airplanes and aircraft belonging to others."[98]  Aircraft may be "offered for charter to the public."[99]

The Claimants argued that the policy can be interpreted as providing coverage because the airplane was hired for exclusive and temporary use with a pilot to transport a specific group of people to a specific location and back.  On the other hand, the Insurers argued that the arrangement between the Global entities and the SLD entities was not chartering a plane with a pilot because Mr. Biggs was paid a salary rather than a per flight fee and Global did not pay a set fee to use the aircraft. But no authority for the Insurers' position was presented – either from the text of the insurance policy itself or from any governing jurisprudence.

This Court located a decision[100] in which a Maryland state court was required to construe an exception to an exclusion in an insurance policy that read as follows:

> This insurance does not apply. . . to the ownership, maintenance, operation, use, loading or unloading of any aircraft other than aircraft chartered with crew by or on behalf of the insured.

The Maryland court consulted the Fifth Circuit's explanation of the three types of charters in which airplanes might be provided with or without a crew, and it

---

[98]    *In re Bozeman*, No. 05-10095, 2006 WL 2860788, at *1 (Bkrtcy. M.D. La. Oct. 3, 2006).

[99]    *Addison Express, L.L.C. v. Medway Air Ambulance, Inc.*, No. 3:04-CV-1954-H, 2006 WL 1489385, at *3 n. 4, (N.D. Tex. May 19, 2006).

[100]    *Walker v. Fireman's Fund Ins. Co.*, 505 A.2d 884, cert. denied sub nom, *Rairigh v. Fireman's Fund Ins. Co.*, 306 Md. 514 (1986).

examined dictionary definitions of the words "charter," "with," and "crew." The court held that "in normal, everyday use, we believe the phrase 'aircraft chartered with crew' is not ambiguous and means a transportation arrangement by which both the plane and its crew are supplied together."[101]  Although the Maryland court's decision is not binding on this Court, this Court finds the decision to be well-reasoned and persuasive.

Other dictionary definitions of the critical words used in the exception to the exclusion also provide guidance. The word "charter" has been defined as "the hiring or leasing of an aircraft, vessel, or other vehicle, especially for the exclusive, temporary use of a group of travelers."[102]  It has also been defined as "an arrangement in which transportation is leased by a group of travelers for their exclusive, temporary use" and as "to hire (a bus or airplane, for example) for the exclusive, temporary use of a group of travelers."[103]  The same dictionary defines the word "lease" as "a contract granting use or occupation of property during a specific period in exchange for a specified. . . form of payment"[104] and defines the

---

[101]    *Walker v. Fireman's Fund Ins. Co*., 505 A.2d at 887.

[102]    Charter, The American Heritage Dictionary of the English Language (5th ed. 2000).

[103]    Charter, The American Heritage Dictionary of the English Language (5th ed. 2000).

[104]    Lease, The American Heritage Dictionary of the English Language (5th ed. 2000).

word "hire" as "to engage the temporary use of for a fee."[105]  Yet another dictionary similarly defines the word charter as "to hire, rent, or lease for usu[ally] exclusive and temporary use" and "of, relating to, or being a travel arrangement in which transportation (as a bus or plane) is hired by and for one specific group of people."[106] That dictionary defines the word "hire" as "to engage the temporary use of for a fixed sum."[107]  When the cited dictionary definitions of the words "charter" and "hire" are compared against the uses of the word "charter" in the jurisprudence cited above, it is clear that chartering an airplane is nothing more than arranging for the exclusive, temporary use of an airplane by a group of travelers.

The exception to the exclusion in the Primary Policy must be "read as a layman would have read it and not as it might be analyzed by an insurance expert."[108] The words must be construed not by determining what *the insurer* intended the words to mean but how the words would have been understood by a reasonable person standing in the shoes of the insured.[109]

---

[105]    Hire, The American Heritage Dictionary of the English Language (5th ed. 2000).

[106]    Charter, Merriam-Webster's Collegiate Dictionary (11th ed. 2007).

[107]    Hire, Merriam-Webster's Collegiate Dictionary (11th ed. 2007).

[108]    *Dawson Farms, L.L.C. v. Millers Mut. Fire Ins. Co.*, 794 So.2d at 952.

[109]    *Dawson Farms, L.L.C. v. Millers Mut. Fire Ins. Co.*, 794 So.2d at 952.

Mr. Vincent and Mr. Savoy entered into a travel arrangement or charter for the shared use of the Piper, which was effectuated when Chris Vincent requested the use of the Piper to take the passengers to the Peach Bowl. The undisputed testimony is that the Piper was never provided to persons on the Vincent side of the equation or on the Savoy side of the equation without a pilot, as was evidenced by Mr. Biggs piloting the Piper on the day of the crash. There is no evidence Global ever participated in any other type of charter arrangement involving an airplane.

Interpreting the word "charter" in order to address the undisputed factual arrangement that existed with the use of the Piper can only be accomplished by giving charter the meaning necessary to support the intent to provide an expansion of coverage to Global away from that which would have otherwise been excluded by the fairly standardized aircraft exclsuion. Accordingly, this Court finds that the agreement between Mr. Vincent and Mr. Savoy for the shared use of the Piper was a charter. More particularly, this Court finds that, on the date of the crash, the Piper was chartered by Global for the exclusive, temporary use of the passengers onboard the plane. It is undisputed that a pilot was always provided by Cheyenne Partners to fly the Piper when it was used, and that was so on the day of the crash in particular. The fact that Mr. Biggs was employed by Global and SLD rather than by Cheyenne Partners is immaterial and the fact that he was paid a salary rather than a per flight fee is immaterial; his services were provided together with the plane. Therefore, this

Court finds that, on the day of the crash, the Piper was chartered to Global (an insured under the policies) with a pilot.  The first element of the exception to the exclusion set forth in the Primary Policy is not ambiguous, and it was satisfied in this case.  Therefore, this Court finds that the Piper was chartered to Global with a pilot when it crashed.

### 2.    <u>Was the Airplane Owned by an Insured</u>?

It is undisputed that the Piper was titled in Cheyenne Partners, LLC at the time of the crash.  No contrary evidence was presented in support of either motion. However, the Insurers argued that the Claimants' allegations in their complaints that Global, Cheyenne, and others were in a single business enterprise to own, maintain, and use the airplane was a judicial confession that Global owned the plane at the time of the crash.  That argument lacks merit.

First, Rule 8 of the Federal Rules of Civil Procedure permits parties to "set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate one."[110]  Thus, a "party may state as many separate claims or defenses as it has, regardless of consistency."[111] Therefore, in drafting their complaints, the Claimants were allowed to allege

---

[110]    Fed. R. Civ. P. 8(d)(2).

[111]    Fed. R. Civ. P. 8(d)(3).

alternative or inconsistent ownership theories, pending proof to be developed in discovery.

Second, an allegation in a pleading is not always the same as a judicial confession. Under Louisiana law, a judicial confession is "a declaration made by a party in a judicial proceeding [which] constitutes full proof against the party who made it."[112] Thus, "a judicial confession is a party's explicit admission of an adverse factual element and. . . has the effect of waiving evidence as to the subject of the admission, of withdrawing the subject matter of the confession from issue."[113] A judicial confession is the equivalent of a stipulation that binds the parties and the court.[114] An allegation in a petition or complaint asserting a fact that has not yet been proven is not a judicial confession.[115] "[I]f every allegation in a pleading were sufficient to prove a fact, there would never be any need for a trial."[116]

---

[112]    Louisiana Civil Code Article 1853.

[113]    *Cheatham v. City of New Orleans*, 378 So.2d 369, 375 (La. 1979).  See, also, See also *C.T. Traina, Inc. v. Sunshine Plaza, Inc.*, 2003-1003 (La. 12/03/03), 861 So.2d 156, 159; *Cichirillo v. Avondale Indus., Inc.*, 2004-2894 (La. 11/29/05), 917 So.2d 424, 428-29.

[114]    *R.J. D'Hemecourt Petroleum, Inc. v. McNamara*, 444 So.2d 600, 601 (La. 1983); *Degeyter v. Allstate Ins. Co.*, No. 09-1582, 2009 WL 3335959, at *2 (W.D. La. Oct. 15, 2009).

[115]    *Dean v. State Farm Mutual Automobile Ins. Co.*, 51,243 (La. App. 2 Cir. 04/05/17), 217 So.3d 611, 618.  See, also, *Nizzo v. Wallace*, 11-467 (La. App. 5 Cir. 12/28/11), 83 So.3d 161, 165, writ denied, 84 So.3d 556 (La. 03/09/12).

[116]    See *Dean v. State Farm Mutual Automobile Ins. Co.*, 217 So.3d at 618.

Whether Global or other companies involved in this litigation were alter egos of their owners or engaged in a single business enterprise are factual issues that will have to be decided by the jury should those issues be presented for adjudication. They are not currently before the court, and there has been no judicial confession deeming those facts to be proven. Furthermore, a finding that a single business enterprise exists might alter the parties' liability for the losses incurred as a result of the airplane crash, but such a finding would not change the fact that Cheyenne Partners owned the plane on the date it crashed.

Accordingly, the evidence presented to date establishes that the Piper was owned by Cheyenne Partners at the time of the incident. Cheyenne Partners is not an insured under the relevant insurance policies; therefore, the second element of the exception to the exclusion is satisfied.

### 3. <u>Was the Airplane Being Used to Carry any Person or Property for a Charge?</u>

The third element of the exception to the exclusion requires that the airplane was not being used to carry persons or property for a charge at the time of the crash in order for the policies to provide coverage. Although the Insurers did not present an argument with regard to this element, this Court will address it.

It is undisputed that none of the persons onboard the airplane at the time of the crash were being charged by Global for their transportation to the football game. Instead, Global was providing transportation to the game free of charge to the

passengers.[117]  Global also paid all of the expenses associated with the use of the airplane on that day.[118]  Cases interpreting the language used in this element of the exception to the exclusion have held that vans carrying children between their homes and a day care center for a flat fee were being used to carry passengers for a charge[119] and that a catamaran taking men on a fishing trip for a fee was being used to carry passengers for a charge.[120]  In both of those decisions, as well as in the cases discussed in those decisions, the focus was on whether a definite amount of money rather than a share of expenses was being charged to the passengers.  In this case, Global was not charging the passengers a fee for their transportation to the football game.  Accordingly, the airplane was not being used to carry passengers for a charge, and the third element of the exception to the exclusion is satisfied.

### 4.    <u>Did the Insurers Waive any Argument Regarding the Other Elements of the Exception to the Exclusion?</u>

In their opposition brief, the Claimants argued that the second and third elements of the Aircraft, Auto or Watercraft exclusion should be deemed satisfied

---

[117]    Rec. Doc. 391-5 at 343, 347.

[118]    Rec. Doc. 391-5 at 347.

[119]    *Johnson v. Allstate Ins. Co*., 505 So.2d 362, 367 (Ala. 1987).

[120]    *North American Specialty Ins. Co v. Bull River Marina, LLC*, 158 F.Supp.3d 1351, 1362 (S.D. Ga. 2016), aff'd in part and rev'd in part on other grounds, 709 Fed. App'x 623 (11th Cir. 2017).

because the Insurers failed to address those two elements in their briefing.  This argument lacks merit.

The Claimants did not assert that the Insurers failed to assert coverage defenses in their answers, and the record clearly shows that the Insurers did plead the contents of their policies in their answers.  Therefore, the Insurers did not waive their right to assert the applicability of policy exclusions.[121]

Furthermore, the Claimants' argument ignores the fact that the Insurers addressed both the first and second elements of the exception and argued that both of them were not satisfied.  More important, because the three elements of the exception to the exclusion are conjunctive rather than disjunctive, the Insurers' arguments were sufficient to challenge the applicability of the exception to the exclusion as a whole without addressing each element individually.  It was not necessary for the Claimants to show that all three elements were not satisfied because, if any one of the elements is not satisfied, the exception to the exclusion does not apply.  The Insurers' response to the Claimants' motion sufficiently addressed the applicability of the exception to the exclusion and there is no basis for construing the Insurers' briefing in a manner that would deem the second and third elements of the exception to the exclusion satisfied.

---

[121]    Louisiana Code of Civil Procedure Article 1005; *Sher v. Lafayette Ins. Co.*, 2007-2441 (La. 04/08/08), 988 So.2d 186, 204.

**F.    Does the Employee Liability Exclusion Apply?**

In opposition to the Claimants' motion, the Insurers argued that the policies provide no coverage for the claims arising out of the death of Vaughn Crisp and the injuries to Wade Berzas because those men were Global's employees.  The Insurers point to an exclusion in the Primary Policy that bars coverage for bodily injury to Global employees arising out of and in the course of either "(a) [e]mployment by the insured; or (b) [p]erforming duties related to the conduct of the insured's business."[122]   The applicability of this exclusion was not raised in the Insureds' motion for partial summary judgment.  This Court finds that determining whether the insurance policies afford coverage for the damages sustained by Mr. Crisp and Mr. Berzas need not be decided at this time and pretermits further discussion of this exclusionary language at this time.

**G.    The Briefs Filed by Parties Other than the Claimants and the Insurers**

The Insurers argued that parties other than the Claimants and Insurers have no standing to weigh in on the issues raised in the motions now before the court.  (Rec. Doc. 427).  In light of the tragic circumstances leading to this litigation, the number of claims and cross-claims asserted, and the limited amount of insurance identified to date, this Court finds that it is not inappropriate for any of the parties to the suit

---

[122]    Rec. Doc. 401 at 120.

to address the important issues raised in the pending motions.  Accordingly, this argument lacks merit.

## Conclusion

For the foregoing reasons, this Court finds that all three elements of the exception to the Aircraft, Auto or Watercraft Exclusion set forth in the relevant insurance policies are satisfied in this case.  Therefore, the Aircraft, Auto or Watercraft Exclusion does not preclude coverage for the Claimants' alleged damages.  This Court consequently recommends that the Claimants' motion for partial summary judgment (Rec. Doc. 391) should be GRANTED, and the Insurers' cross-motion for partial summary judgment (Rec. Doc. 414) should be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within

fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[123]

      Signed at Lafayette, Louisiana, this 29th day of July 2022.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[123]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).