UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| ENDURANCE AMERICAN INSURANCE COMPANY | CIVIL ACTION NO. 20-0571 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CHEYENNE PARTNERS, LLC, ET AL. | MAGISTRATE JUDGE AYO |

**MEMORANDUM RULING**

Before the Court is a Motion for Partial Summary Judgment (Record Document 422) filed by Cross-Claimants, Steven Ensminger, Jr., Stephen Wade Berzas individually and on behalf of his minor children M.B., G.B., C.B. and K.B. and MacKenzie Berzas, Mignone Denay Crisp individually and in her capacity as Administratrix for the Estate of Robert Vaughn Crisp II, and Kristie Danielle Britt (collectively referred to herein as "Cross-Claimants" or "Movants"). As a matter of law, Movants seek a finding that Ian Biggs ("Biggs") was an employee of Southern Lifestyle Development ("SLD") and was acting in the course and scope of his employment with SLD when the Piper N42CV crashed on December 28, 2019. See id. SLD has opposed the motion, arguing first that the issues of course and scope require proof of material facts still in dispute and resolution of such factual questions falls solely within the purview of the factfinder at trial. See Record Document 486. While conceding that Biggs was a SLD employee (albeit, part-time), SLD alternatively submits that Movants' motion fails as to the course and scope inquiry. See id. Movants replied. See Record Document 498. For the reasons set forth below, the Motion for Partial Summary Judgment is **GRANTED** and the Court finds, as a matter of

law, that Biggs was an employee of SLD and was acting in the course and scope of his employment with SLD when the Piper N42CV crashed on December 28, 2019.

## BACKGROUND

A small airplane, a Piper N42CV (hereinafter referred to as "the Piper" or "the aircraft"), crashed shortly after takeoff in Lafayette, Louisiana, on December 28, 2019, while headed to the Peach Bowl in Atlanta, Georgia. The detailed facts of this case have been set forth in numerous rulings. Here, the Court will focus on the facts pertinent to the instant motion. Many facts set forth by Movants in their Statement of Uncontested Material Facts (Record Document 422-2) went uncontested by SLD. See Record Document 486-1. The uncontested facts have been deemed admitted. All contested facts will be noted in the instant ruling.

At the time of the crash in December 2019, the Piper was owned by Cheyenne Partners, LLC ("Cheyenne Partners"). Biggs was the pilot of the Piper on December 28, 2019 and was killed in the crash. It is undisputed that SLD employed Biggs on the date of the plane crash at issue in this case. SLD paid 50% of Biggs' salary at the time of the plane crash. The other 50% of his salary was paid by Global Data Systems, Inc. ("GDS"). Biggs' salary from SLD was not contingent on his flying SLD's chosen passengers on the Piper. Biggs remained on the SLD payroll through all of 2019. See Record Document 422-3 (SLD Deposition) at 152.

As part of Biggs' employment with SLD, he was expected to be the full-time pilot of the Piper. As the full-time pilot of the Piper, Biggs managed and served as the custodian of the aircraft including scheduling flights, making sure the aircraft was maintained, ensuring it was full of fuel, it was clean, and it was operational for whomever

required it. SLD was aware of, understood, and accepted Biggs' broad duties and responsibilities with respect to the aircraft.

SLD and GDS agreed to pay an hourly rate to Cheyenne Partners for use of the aircraft. See Record Document 422-3 at 136. SLD and GDS also agreed to each pay 50% of the maintenance costs associated with the Piper. See id. The Cheyenne Partners enterprise, that is, providing access to the aircraft and having Biggs pilot same, provided "an excellent value" to SLD. Id. at 143. When Biggs flew the Piper, SLD benefitted. See id. at 204. Biggs was "an asset" and "was important" to SLD. Id.

The agreement relating to Cheyenne Partners and the use of the Piper enhanced SLD's ability to conduct business in a more convenient and efficient manner. Biggs was officially hired by SLD on July 16, 2015 and continued his employment with SLD, without interruption, until the plane crash on December 28, 2019. SLD considered Biggs the chief pilot of the Piper. According to the agreement between SLD and GDS as to the employment of Biggs, SLD paid 50% of Biggs' salary and a car allowance; while the other 50% of Biggs' salary was paid by GDS, including his 401(k) and health insurance. Rodney Savoy ("Savoy"), as the owner and manager of SLD, made the decision to jointly employ Biggs with GDS.

Movants contend that SLD, through Savoy, had the ability and authority to control and dictate Biggs' employment tasks, activities, and responsibilities with respect to his piloting and management of the aircraft, as well as the ability and authority to terminate Biggs' employment. SLD contests this point, except to agree that Savoy and SLD could have terminated Biggs' employment as a pilot. See Record Document 486-1 at ¶ 22.

SLD's 50% payment of Biggs' salary was not contingent on his operation of the Piper only for SLD.  Biggs was not compensated or employed on a flight-by-flight basis, and SLD paid 50% of his salary even when he did not fly the aircraft for SLD.  SLD paid Biggs' salary for the month of November 2019, when SLD did not use the aircraft and Biggs did not schedule, coordinate, or pilot any flights for SLD.  Biggs was employed and expected to be the full-time pilot of the aircraft 100% of the time.  Biggs was responsible for scheduling flights on the aircraft for SLD and other Savoy-related entities and third parties.  Biggs was required to be available 24 hours a day to operate as the pilot, manager, and scheduler of the aircraft for SLD.  Ultimately, Biggs' job duties were much broader than just sitting in the cockpit of the aircraft, and SLD was aware of, understood, and vested him with these duties and responsibilities.  SLD needed the aircraft and a pilot to conduct its real estate and development business in a more convenient and efficient manner.

In a parallel workers' compensation litigation, SLD admitted that Biggs was a co-employee of SLD and GDS.  Savoy further admitted that SLD had an agreement with GDS to co-employ Biggs to operate and pilot the aircraft, and such agreement was in force at the time of the plane crash.  As stated previously, SLD contests that Biggs was in the course and scope of his part-time employment with SLD at the time of the plane crash.  However, SLD admitted in its deposition that "Savoy was the ultimate authority and decision maker concerning . . . Biggs . . . as far as flying the plane and when it went." Id. at 170.  SLD paid 50% of Biggs' salary and related fringe benefits, including his salary for December 2019.  SLD had the ability to terminate (dismiss) Biggs' employment at any time.  Additionally, in email communications with its workers' compensation carrier's third-

party claims administrator, SLD confirmed Biggs' job and employment as the pilot of the aircraft and affirmatively indicated that: (1) Biggs was within his authority to schedule all flights for the aircraft; (2) Biggs was acting was in the course and scope of his duties on December 28, 2019; and (3) Biggs was performing his duties as pilot on December 28, 2019.  See Record Document 422-11.

Biggs regularly fielded questions from SLD employees concerning travel on the aircraft, including time and distances, how long it would take to get from one place to another, and the costs associated with flights.  Biggs was expected to be available to operate as the pilot of the plane for SLD virtually 24 hours a day.  For the first few years of the arrangement, Biggs created and kept a joint electronic calendar to schedule and book flights on the Piper.  See id. at 317.

Again, Movants now seek a finding that Biggs was an employee of SLD and was acting in the course and scope of his employment with SLD when the Piper crashed on December 28, 2019.  See Record Document 422.  SLD has opposed the motion, arguing factual issues preclude summary judgment and Movants' motion fails as to the course and scope inquiry.  See Record Document 486.

## LAW AND ANALYSIS

**I.    Summary Judgment Standard**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

See id. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). A court may consider pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits when determining whether summary judgment is appropriate. See Fed. R. Civ. P. 56(c).

"A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." Streber v. Hunter, 221 F.3d 701, 737 (5th Cir. 2000). Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial. See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir. 1993).

## II. Course and Scope of Employment

SLD does not contest that Biggs was employed – at least part-time – by SLD in December 2019. See Record Document 486 at 10. Thus, the only issue for the Court to decide is whether Biggs was in the course and scope of his employment with SLD on December 28, 2019. See id.

"Vicarious liability is liability for the tortious act of another person. Vicarious liability is most often imposed on an employer for the torts of its employee committed in the course and scope of employment. At common law, the Latin phrase *respondeat superior*

('let the master answer') denotes this type of liability. In Louisiana, this concept is codified. See LSA–C.C. art. 2320; LSA–R.S. 9:3921." Quebedeaux v. Dow Chem. Co., 2001-2297 (La. 6/21/02), 820 So. 2d 542, 545 n. 5 (internal citations omitted). The Louisiana Supreme Court has held that an "individual may simultaneously be the employee of more than one employer for the purposes of vicarious liability under La. Civ.Code art. 2320." Knoten v. Westbrook, 2014-0892 (La. App. 4 Cir. 5/18/16), 193 So. 3d 380, 388, *writ denied*, 2016-1260 (La. 10/28/16), 208 So. 3d 890. The "one master rule" was repudiated such that both employers are solidarily liable for the injuries caused by an employee's negligence. Morgan v. ABC Mfr., 97-0956 (La. 5/1/98), 710 So. 2d 1077, 1082. This more modern approach focuses on the concept of "enterprise liability," not the employer's control of the employee's actions. Id. at 1083.

As stated in both Article 2320 and Section 3921, an employer is only vicariously liable for an employee's tortious conduct that is committed within the course and scope of employment. See Orgeron v. McDonald, 93–1353 (La.7/5/94), 639 So.2d 224, 226. The determination of whether an employee was in the course and scope of his employment at the time of an incident is a factual determination. See Carter v. Pointe Coupee Par. Sch. Bd., 2018-1035 (La. App. 1 Cir. 12/21/18), 268 So. 3d 1064, 1073. "The 'course' of employment refers to time and place while the 'scope' of employment refers to employment-related risk of injury." Baumeister v. Plunkett, 95–2270 (La.5/21/96), 673 So.2d 994, 996. In Reed v. House of Decor, Inc., 468 So.2d 1159 (La.1985), the Louisiana Supreme Court explained:

> Determination of the course and scope of employment is largely based on policy. The risks which are generated by an employee's activities while serving his employer's interests are properly allocated to the employer as a cost of engaging in the enterprise. However, when the party (the alleged

7

>  employer) upon whom vicarious liability is sought to be imposed had only a marginal relationship with the act which generated the risk and did not benefit by it, the purpose of the policy falls, and the responsibility for preventing the risk is solely upon the tortfeasor who created the risk while performing the act.

Id. at 1162. "Generally, an employee's conduct is within the course and scope of his employment 'if the conduct is of the kind he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer.'" Migliore v. Gill, 11-407 (La. App. 5 Cir. 12/13/11), 81 So. 3d 900, 903, *writ denied*, 2012-0094 (La. 3/9/12), 84 So. 3d 555. "The conduct must be 'so closely connected in time, place, and causation to [the employee's] employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer's interest.'" Id. In determining whether the employee's conduct is employment-rooted, courts should assess the following factors:

>  (1) the payment of wages by the employer;
>
>  (2) the employer's power of control;
>
>  (3) the employee's duty to perform the particular act;
>
>  (4) the time place and purpose of the act in relation to service of the employer;
>
>  (5) the relationship between the employee's act and the employer's business;
>
>  (6) the benefits received by the employer from the act;
>
>  (7) the motivation of the employee for performing the act; and
>
>  (8) the reasonable expectation of the employer that the employee would perform the act.

Orgeron, 639 So. 2d at 227.

### III. Analysis

Movants argue that on December 28, 2019, Biggs was exercising the functions for which he was employed by SLD, that is, a full-time pilot and manager/custodian/scheduler of the Piper. See Record Document 422-1 at 20. Conversely, SLD argues that Biggs was not within the course and scope of his SLD employment at the time of the plane crash. SLD argues that "the December 28, 2019 flight had nothing to do with SLD," but rather the flight was for GDS employees and GDS family/friends. Record Document 486 at 8.

As to the course element, SLD submits that Biggs was not being paid wages by SLD when the plane crash occurred; SLD had no control over Biggs relative to the subject flight; SLD's business did not benefit from the subject flight; and Biggs piloting the Piper on December 28, 2019 was not related to any service provided to SLD. See id. at 14-19. As to the scope element, SLD posits that Biggs was not employed by SLD to pilot, manage, keep, or schedule the Piper for GDS; a flight for GDS employees and guests did not further SLD's real estate business development business; and Biggs' operation of the Piper for GDS did not fall within the scope of his employment with SLD. See id. at 19-21.

Much of these SLD contentions are conclusional denials and, in sum, SLD has failed to present specific facts to create a genuine issue for trial. Movants met their summary judgment burden by proffering uncontested facts demonstrating that Biggs was a full-time co-employee of both SLD and GDS. Each of those entities shared equally in paying Biggs' salary and other fringe benefits. Biggs was being compensated by SLD for *all* flights he coordinated and conducted in relation to the Piper. He was paid his full salary by SLD for the time he spent engaged in the activity of piloting and managing on

December 28, 2019.  Moreover, it is undisputed that SLD had some degree of control and/or right to control Biggs' piloting, managing, maintaining, and scheduling the Piper. Biggs was on call 24 hours a day.  As the full-time pilot, he managed and served as the custodian of the aircraft, including making sure the aircraft was maintained and was operational for whomever required it.  SLD was aware of, understood, and accepted Biggs' broad duties and responsibilities with respect to the Piper.  Each time Biggs flew the Piper, he obtained additional flight hours, which was critical to his continued training as a private commercial pilot.  Biggs' flying hours with passengers also counted toward his compliance with federal licensure regulations.  All of this was a direct and continuing benefit to SLD, even if the specific flight was not for SLD related activities.

There is no dispute that Biggs was required and expected to be a full-time pilot. Considering the broad duties referenced above, Biggs was required to do more than just sit in the cockpit of the Piper. Biggs' continued, prudent operation of the Piper did, in fact, benefit SLD.  Thus, SLD had a reasonable expectation that Biggs would or could pilot the Piper at any given time, including on December 28, 2019.  This is an instance where Biggs' conduct on December 28, 2019 was of the kind he was employed to perform, occurred substantially within the authorized limits of time and space, and was activated at least in party by a purpose to serve SLD.  Biggs' conduct on December 28, 2019 was SLD employment-rooted.

## CONCLUSION

For the reasons set forth above, the Motion for Partial Summary Judgment is **GRANTED**.  The Court finds, as a matter of law, that Biggs was an employee of SLD and

was acting in the course and scope of his employment with SLD when the Piper N42CV crashed on December 28, 2019.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 9th day of March, 2023.

_____
United States District Judge